IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 15 |
| ABENGOA CONCESSIONS | ) | |
| INVESTMENTS LIMITED,[1] | ) | Case No. 16-12590 (KJC) |
| Debtor in a Foreign Proceeding. | ) | |
| | ) | |
| | ) | |

**VERIFIED PETITION UNDER CHAPTER 15
FOR ORDER AND FINAL DECREE GRANTING
RECOGNITION OF FOREIGN MAIN PROCEEDINGS
AND PERMANENT INJUNCTIVE AND OTHER RELATED RELIEF**

Abengoa Concessions Investments Limited ("**ACIL**" or the "**Foreign Debtor**"), in its

capacity as the duly authorized foreign representative (the "**Foreign Representative**"), by and

through its United States Counsel, DLA Piper LLP (US), files this verified petition in furtherance

of the official form petition [D.I. 1] filed contemporaneously herewith (the verified petition and

official form petition, collectively, referred to hereinafter as the "**Petition**"), under sections 1504

and 1515 of chapter 15 of title 11 of the United States Code (the "**Bankruptcy Code**"),

commencing cases under chapter 15 and seeking an Order and Final Decree granting recognition

of the foreign proceeding described herein (the "**UK Proceeding**") as a foreign main proceeding,

as such term is defined in section 1502(4).

In support of the Petition, the Foreign Representative has also filed (a) the *Memorandum

of Law in Support of Motion for Chapter 15 Recognition and Final Relief* (the "**Memorandum

of Law**"), (b) the *Declaration of R. Craig Martin Regarding Determination of Foreign Law*

("**Martin Declaration**"), and (c) the *Declaration of Rebecca Lois Jarvis in Support of Verified*

---

[1]     The last four digits of the Foreign Debtor's Registered Number are 8214.  The Foreign Debtor's registered
office address is St. Martin's House, 1 Lyric Square, London, England W6 0NB

*Petition Under Chapter 15 for Order and Final Decree Granting Recognition of Foreign Main Proceedings and Permanent Injunctive and Other Related Relief* (the "**Jarvis Declaration**").

The Foreign Representative petitions this Court as follows:

## PRELIMINARY STATEMENT[2]

1.      Abengoa, S.A. was incorporated in Seville, Spain on January 4, 1941, as a limited liability company and was transformed into a limited liability corporation (a "**sociedad anónima**" or "**S.A.**" in Spain) on March 20, 1952.  As of the end of 2015, Abengoa, S.A. was the parent company of 686 other companies around the world, including 577 subsidiaries, 78 associates, 31 joint ventures, and 211 Spanish partnerships (*uniones temporales de empresa*) (collectively, the "**Abengoa Group**").  ACIL, a member of the Abengoa Group, is an investment holding company with a center of main interests in England and Wales, United Kingdom. ACIL's primary asset is its ownership of 41.47% of the shares in Atlantica Yield PLC ("**YieldCo**").

2.      As set forth in more detail below, the Abengoa Group has undertaken a global restructuring (the "**Global Restructuring**"), in which members of the Abengoa Group have initiated proceedings in Spain, the United States, the United Kingdom, Brazil, and Peru.

3.      The proceedings in Spain commenced on November 25, 2015 when Abengoa, S.A. and twenty-four other subsidiary companies filed a communication with Commercial Court No. 2 in Seville, Spain (the "**Spanish Court**") for protection under article 5 bis (the "**5 bis Proceeding**" or the "**Spanish Proceeding**") under the Spanish Insolvency Law.    On December 14, 2015, the Spanish Court issued an order admitting the notice and granted protection provided for under article 5 bis of the Spanish Insolvency Law.  Thereafter, numerous

---

[2]      Capitalized terms not otherwise defined in this Preliminary Statement have the meanings given to them below.

other companies within the Abengoa Group (collectively, the "**5 bis Companies**") also sought protection under article 5 bis of the Spanish Insolvency Law, and the Spanish Court issued additional decrees accepting those filings and approving the article 5 bis relief to all of the 5 bis Companies.  On March 29, 2016, the 5 bis Companies filed voluntary petitions under chapter 15 of the Bankruptcy Code (the "**Abengoa Chapter 15 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  During the period following the commencement of the 5 bis Proceedings by the 5 bis Companies, ACIL, entered into certain loan transactions, which, in general terms, allowed ACIL to pledge its shares in YieldCo in exchange for the right to borrow funds that it then on-lent to the members of the Abengoa Group.

4.      On March 29, April 6, April 7, and June 12, 2016 (collectively, the "**Petition Date**"), certain companies within the Abengoa Group (the "**Chapter 11 Debtors**") commenced cases (the "**Chapter 11 Cases**") in the Bankruptcy Court by filing voluntary petitions for relief under Chapter 11.  On October 31, 2016, the Bankruptcy Court approved the *Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code* (Case No. 16-10790; D.I. 748) (the "**Disclosure Statement**") as having adequate information under section 1125 of the Bankruptcy Code.  Thereafter, the Chapter 11 Debtors commenced solicitation of the *Debtors' First Amended Plans of Reorganization and Liquidation* (Case No. 16-10790; D.I. 747) (the "**Chapter 11 Plan**").  The Chapter 11 Plan seeks to implement certain components of the Global Restructuring.  A hearing to consider confirmation of the Chapter 11 Plan will take place on December 6, 2016 before the Bankruptcy Court.[3]

5.      On November 9, 2016, ACIL commenced the UK Proceeding by initiating a voluntary procedure (a Company Voluntary Arrangement) under Part I of the Insolvency Act

---

[3]      Additional details regarding the Spanish Proceedings, the Abengoa Chapter 15 Cases, and the Chapter 11 Cases can be found the *Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code* filed in the Chapter 11 Cases at D.I. 748.

1986 which enables a company to agree a binding composition in satisfaction of its debts or scheme of arrangement of its affairs with its unsecured creditors (the "**CVA**")[4] by delivery of the CVA proposal (including ACIL's statement of affairs as of September 30, 2016) to the insolvency practitioners appointed to act as nominees in regard to the CVA (the "**Nominees**"). Generally, the role of the Nominees, who must be licensed insolvency practitioners, is to review the proposal and to oversee the CVA procedure up to and including approval of the CVA at the creditors' meeting.  In that vein, the Nominees filed a report with respect to the CVA (the "**Nominees Report**"), together with the CVA proposal (including ACIL's statement of affairs as of September 30, 2016) at the High Court of Justice, Chancery Division, No. CR-2016 007309 (the "**UK Court**").   The UK Proceeding was initiated in accordance with the Global Restructuring to effectuate the relevant terms of the Master Restructuring Agreement (as defined herein) with respect to ACIL and to impose the Standard  Restructuring Terms on ACIL's Guarantee Creditors that do not accede to the Master Restructuring Agreement.

6.     This Petition, the Jarvis Declaration, and the materials attached to the Martin Declaration, each filed contemporaneously with this Petition, verify the facts pertinent to, and necessary to sustain, this Petition's request for (a) a finding that the UK Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code; (b) a finding that the Foreign Representative is a "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code; (c) entry of an order recognizing the UK Proceeding as a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code; and (d) permanent injunctive and other relief necessary to ensure the effective implementation of the CVA, which,

---

[4]     Capitalized terms not otherwise defined in this section have the meanings given to them in the CVA, which is attached as *Exhibit 3* to the Martin Declaration.

as explained herein, is a required step in the implementation of the Global Restructuring contemplated under the Master Restructuring Agreement.

7.     As required by section 1515(b) of the Bankruptcy Code, this Petition is accompanied by a copy of the CVA proposal.  In accordance with Bankruptcy Code § 1515(c), the Foreign Representative has also filed herewith a disclosure and verified statement identifying all foreign proceedings with respect to the Foreign Debtor that are known to the Foreign Representative.  (*See* Statements of Foreign Representative Required by Bankruptcy Code § 1515(c) and Bankruptcy Rule 1007(a)(4)).

8.     The Foreign Representative seeks relief in aid of the UK Proceeding and the overall restructuring negotiations to protect and preserve the Abengoa Group's ongoing restructuring efforts.  Under the UK Proceeding, ACIL stays in control of its assets and continues to operate its business, much like a Chapter 11 debtor-in-possession.  On November 15, 2016, the Directors of ACIL appointed ACIL as the Foreign Representative in connection with these chapter 15 cases through a resolution of the board.

9.     The Foreign Representative respectfully submits that this Petition satisfies the requirements of chapter 15 of the Bankruptcy Code because the UK Proceeding is a foreign proceeding as defined in section 101(23) of the Bankruptcy Code, the Foreign Representative is a foreign representative as defined in the Bankruptcy Code § 101(24), and all other requirements for recognition have been fulfilled.  Additionally, the Petition satisfies the requirements in Bankruptcy Code §§ 1515 and 1517 mandating recognition.  For these reasons, as more fully explained below, the Foreign Representative respectfully requests that the Court grant the relief requested in this Petition.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this case under sections 1334 and 157 of Title 28 of the United States Code and the "Amended Standing Order of Reference" of the United States District Court for the District of Delaware (Sleet, C.J.), dated February 29, 2012.

11.    The Foreign Representative has properly commenced this case under sections 1504 and 1515 of the Bankruptcy Code.  This Petition is a core proceeding under section 157(b)(2)(P) of Title 28 of the United States Code.

12.    The Foreign Debtor has its principal assets in the United States in this district by virtue of the fact that the Foreign Debtor has deposited a retainer with DLA Piper LLP (US) in which it has an ownership interest.  These funds are held in a Wells Fargo bank account in the state of Delaware in accordance with Delaware Rule of Professional Responsibility 1.5.  (*See* Martin Decl. ¶ 4.)  Additionally, the Foreign Debtor is a party to several contracts governed by the laws of the State of New York, being the indentures.

13.    Venue for this case is proper in this Court under sections 1410(1) and 1410(3) of Title 28 of the United States Code because the principal assets of the Foreign Debtor in the United States are located in this judicial district.  Additionally, venue in this district is consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the Foreign Representative.

14.    The statutory bases for the relief requested in this Petition are sections 101(23), 101(24), 105, 1502, 1504, 1507, 1509, 1510, 1515, 1516, 1517, 1520, and 1521 of the Bankruptcy Code.

## BACKGROUND

### A.    ACIL and YieldCo

15.    ACIL is an investment holding company with a center of main interests in

England and Wales, United Kingdom.  ACIL's assets consist of (a) a 41.47% ownership interest in Atlantica Yield PLC ("**YieldCo**"), the book value of which as of September 30, 2016 was $314,349,000; (b) intercompany receivables with a book value of $333 million (on which little realizable value is placed); (c) cash on hand in the amount of $54,000, (d) interest in a $250,000 retainer held by DLA Piper LLP (US) in Delaware, and (e) rights under various loan documents governed by U.S law, English law, or Spanish law.  YieldCo is a NASDAQ listed company that owns, manages, and acquires revenue generating assets.  YieldCo relies on the Abengoa Group for funding and know-how in relating to the operation of its underlying investments.  As such, YieldCo's market value depends on the continued existence of the Abengoa Group and the Nominee's Report indicates that YieldCo's value would be impacted detrimentally if the Abengoa Group were to not reorganize.

16.    ACIL's liabilities, which include contingent liabilities, exceed its assets and consist of (a) secured claims totaling $653 million (which represents the nominal, not book value, of principal and interest as of September 30, 2016); (b) unsecured claims totaling $108 million; and (c) the claims of the Guarantee Creditors in the aggregate amount of $6 billion.

**B.**    **The Global Restructuring**

*The 5 Bis Proceedings*

17.    On several dates (November 25, 2015, December 3, 15, and 28, 2015, January 27, 2016, and February 1, 2016), Abengoa, S.A. and the 5 bis Companies filed notice with the Spanish Court that they had commenced negotiations with their principal creditors in order to reach a global agreement on the refinancing and restructuring of their liabilities to achieve the viability of the Abengoa Group in the short and long term.  The Spanish Court issued orders on December 14 and 22, 2015, and January 15, 2016, admitting the notice and granting the Article 5 bis Companies with the protection of the law of 22/2003, of July 9, on insolvency.

18.     The Abengoa Group commenced negotiations with a large and diverse number of its main financial creditors, including a group of lenders that formed a coordinating committee, advised by Sullivan & Cromwell LLP, Uria Menendez, and KPMG, and a group of bondholders, advised by Clifford Chance and Houlihan Lokey.  The Abengoa Group, advised by Linklaters, Alvarez & Marsal, Lazard and, Cortés, Abogados, began preparing a business viability plan and the terms of a possible restructuring agreement.  During this period, the Abengoa Group negotiated the following facilities during the negotiation process to fund its general liquidity needs:

- A €125,000,000 syndicated facility agreement dated September 23, 2015 between Abengoa, as borrower, and certain companies of its group as guarantors and certain finance entities (the "**Revolving Facilities**");

- A $130,000,000 secured term facility agreement dated October 22, 2015 between ACIL, as borrower, and Talos Capital Limited; and

- A €106,000,000 facility agreement dated December 24, 2015 between ACIL, as borrower, certain companies in the Abengoa Group as guarantors and certain finance entities (the "**December Facility**").  The December Facility was used for general corporate purposes, and the Abengoa Group granted a security interest over certain shares of YieldCo (and at this time also pledged YieldCo shares as security for the Revolving Facilities);

- A €137,094,751.30 facility agreement dated March 21, 2016 between ACIL, as borrower, certain companies of its group as guarantors and certain finance entities (the "**Bondholders Facility**").  The Bondholders Facility was used for general corporate purposes, and ACIL granted a security interest over certain shares of YieldCo.

- A $211,000,000 secured facility agreement entered into on September 18, 2016 between, amongst others, ACIL as borrower and Global Loan Agency Services Limited as agent.  This facility was utilized, in part, to repay the Talos Capital Limited facility.

19.     Alvarez & Marsal prepared a Viability Plan based on a preliminary review of specific projects, the existing project pipelines, and the most recent information and thinking with respect to asset disposals and financial debt.  As part of this evaluation, Alvarez & Marsal

evaluated (i) 200 projects, each above €2.5 million that covered 90% of the Abengoa Group's €8.6 billion backlog as of December 31, 2015, and (ii) each business line by region and operating division with the head of each business line.

20.      On December 30, 2015 and January 25, 2016, Alvarez & Marsal presented the Board of Directors of the Abengoa Group with viability plans that defined the structure of the future activity of the Abengoa Group.  This Viability Plan was presented to the public in a conference call held on Wednesday, February 17, 2016.  In broad general terms, this Viability Plan analyzed the old Abengoa Group, proposed a new business model for a new Abengoa Group, presented both valuation and cash flows, risks and opportunities, and set forth certain recommendations and conclusions as to the viability of the proposed new Abengoa Group.  This plan did not contain a financial restructuring proposal but was an operational plan.

21.      In relation to the negotiations between Abengoa, S.A. and a group of its creditors comprised of banks and holders of bonds issued by certain companies within the Abengoa Group, the company announced on March 10, 2016, that it had agreed with certain creditors on the terms of an agreement to restructure the financial indebtedness and recapitalize the group.

22.      On March 16, 2016, the Abengoa Group presented its Business Plan & Financial Restructuring Plan in Madrid and permitted public participation by telephone.  At this presentation, Alvarez & Marsal presented the Viability Plan, and Lazard presented the Restructuring Proposal.  The Banks' advisors, KPMG, and the Bondholders' advisor, Houlihan Lokey, presented their key conclusions regarding the Viability Plan and Restructuring Proposal. The Abengoa Group's Spanish law firm, Cortés Abogados set forth the company's plan for presenting a standstill agreement to all financial creditors between March 18 and 27, 2016.  A true and correct copy of this presentation is attached to the Martin Declaration as Exhibit 4.

*The Standstill Agreement Homologation Proceeding*

23.     While the Restructuring Proposal presented on March 16, 2016, sets forth the framework for the restructuring of the Abengoa Group, in order for the Spanish Court to homologate such proceeding in accordance with the Spanish Insolvency Law, 75% of the requisite creditors needed to accede to the agreement.  In order to permit the Abengoa Group with sufficient time to solicit and obtain the requisite supermajority votes with respect to the Restructuring Proposal, the Abengoa Group requested its financial creditors to adhere to a standstill agreement (the "**Standstill Agreement**") under which the Abengoa Group companies that are signatories to the Standstill Agreement requested its financial creditors to stay certain rights and actions vis-à-vis the relevant Abengoa companies during a period of 7 months from the date of the Standstill Agreement.  Abengoa S.A. requested that the beneficial owners of the affected bond issues indicate their accession to the Standstill Agreement through a standstill accession notice (the "**Standstill Accession Notice**") that was made available for the beneficial owners of the Notes through Lucid Issuer Services Limited.

24.     The Standstill Agreement had received more than the necessary consents by value of the creditors holding the debt affected by the Standstill Agreement to permit commencement of a Judicial Confirmation Request to apply the Standstill Agreement to all of the holders of the affected debt.

25.     On March 28, 2016, certain members of the Abengoa Group filed the Judicial Confirmation Request for homologation of the Standstill Agreement.  On that same day, the clerk of the Spanish Court published a resolution *(Providencia)* of the Spanish Court accepting the jurisdiction over the Judicial Confirmation Request and imposing a moratorium on

enforcement actions against the members of the Abengoa Group that were party to that proceeding. Certain parties challenged the request for homologation of the Standstill Agreement.

26.     The Spanish Court issued an opinion on October 24, 2016, whereby the Spanish Court, among other things, upheld the Standstill Agreement. The Standstill Agreement expired by its terms on October 28, 2016. On that date, October 28, 2016, the Participating Creditors under the Master Restructuring Agreement presented to the Spanish Court the Master Restructuring Agreement homologation, which, among other things, would extend the Standard Restructuring Terms to the Non-Consenting Creditors, which was acknowledged by the Spanish Court on November 8, 2016.

*The Master Restructuring Agreement*

27.     The Master Restructuring Agreement[5] was executed in Spain by Abengoa, S.A., certain of its subsidiaries, as Original Obligors, the Original Participating Creditors, the Original Intragroup Creditors, the Restructuring Agent, and the Information Agent on September 24, 2016. ACIL executed the Master Restructuring Agreement as an Obligor on October 6, 2016.

28.     The Master Restructuring Agreement addresses Existing Financial Indebtedness compromised of Non-Affected Debt, which is generally debt that is secured, Affected Debt, and Non-Spanish Debt to be Restructured. The Affected Debt consists of Non-Compromised Debt, mostly emergency financing, which was borrowed or guaranteed by ACIL and provided to the Abengoa Group during its financial distress, and Compromised Debt. The Compromised Debt consists of intragroup debt owed by some Obligators to the Intragroup Creditors, bonds, Existing Bonding Facilities, other guarantees, corporate financing, non-recourse debt in progress,

---

[5]     Capitalized terms not otherwise defined herein that are used in this discussion of the Master Restructuring Agreement shall have the meaning given to them in the Master Restructuring Agreement. Additionally, this is a summary of the Master Restructuring Agreement, which is a complex document, and all parties are directed to the Master Restructuring, which can be found as an Exhibit to D.I. 577 in the Chapter 11 Proceedings. The terms and conditions of the Master Restructuring Agreement shall govern over this summary should any aspect of this summary be inconsistent with the Master Restructuring Agreement.

payments by banks, reverse factoring, derivatives which have been closed-out as of the Signing Date of the Master Restructuring Agreement, and any guarantees given by the Spanish Obligors in respect of the non-closed out derivatives as of the Signing Date. This Compromised Debt is listed on Schedule 6 to the Master Restructuring Agreement. Non-Spanish Debt to be Restructured is Existing Financial Indebtedness owed by Non-Spanish Obligors as debtors and guarantors listed in Part D of Schedule 6 to the Master Restructuring Agreement and holders of this debt can consent to the Master Restructuring Agreement and thereby agree to have their debt restructured under the Alternative Restructuring Terms or the Standard Restructuring Terms.

29.     In general terms, the Master Restructuring Agreement provides that the Standard Restructuring Terms will result in a 97% write-off of all Affected Debt and Non-Spanish Debt to be Restructured as of the Restructuring Completion Date, except as otherwise stated in Article 3.1.4(a)(ii) of the Master Restructuring Agreement. This write down will be accompanied by an amendment of all payment obligations of the Obligors under the Affected Debt and the Non-Spanish Debt to be Restructured such that these obligations will not fall due until the date that is 10 years after the Restructuring Completion Date, during which time, the amended obligation will not earn interest. These Standard Restructuring Terms will be applied to Non-Consenting Creditors pursuant to the Homologation procedure described in clause 6 of the Master Restructuring Agreement; *provided, however*, that with respect to Liquidating Entity Debt, that debt will not be subject to the Standard Restructuring Terms (or the Alternative Restructuring Terms) but shall instead be maintained against the Liquidating Entities and will not be subject to or affected by the Master Restructuring Agreement. Intragroup Affected Debt held against the Debtors by Non-Debtor Affiliates that accede to the Master Restructuring Agreement will be amended according to the Standard Restructuring Terms.

30.    The Alternative Restructuring Terms are offered to all of the Existing Creditors except for the Intragroup Creditors and their implementation is optional for each Existing Creditor as an alternative to the Standard Restructuring Terms.  As such, each Existing Creditor that would like to receive the Alternative Restructuring Terms needs to accede to ths Master Restructuring Agreement and expressly elect to restructure its Affected Debt and its Non-Spanish Debt to be Restructured in accordance with the Alternative Restructuring Terms.  In general terms, under the Alternative Restructuring Terms, Existing Loans/Notes and Existing Bonding Facilities shall be reduced by means of an initial 70% write-off except that no write-off shall be applied to part of the Uncalled Existing Bonding Facilities held by Consenting Existing Creditors.  Under sub-clause 3.1.5(b)(C) of the Master Restructuring Agreement, additional write-offs may be applied to ensure that the aggregate amount of Consenting Old Money does not at any time exceed €2.7 billion.  Once Existing Creditors elect the Alternative Restructuring Terms, certain of those Existing Creditors may make additional elections, including, but not limited to, electing to participate in the New Money Financing or agreeing to provide New Bonding Facilities, as governed by and subject to the Master Restructuring Agreement and the Term Sheet.  The Reorganizing Debtors will provide consideration with respect to these various new debt instruments issued.

31.    While the primary focus of the Master Restructuring Agreement is to provide for a contractual resolution of the Spanish Obligors' obligations owing to Existing Creditors, due to the complexity of the Abengoa Group's debt perimeter, certain Non-Spanish Debt to be Restructured is subjected to Non-Spanish Compromise Proceedings, such as the ACIL CVA.

*The CVA and the UK Proceeding*

32.     The Master Restructuring Agreement provides that ACIL will propose the ACIL CVA, which will also be submitted to this Bankruptcy Court for recognition and to permit ACIL to seek additional assistance and appropriate relief from this Bankruptcy Court.  On November 9, 2016, ACIL launched the CVA and commenced the UK Proceeding by sending a copy of the CVA proposal to the Nominees.  Also, on November 9, 2016, the Nominees issued a report with respect to the CVA and sent that report, together with the CVA, to ACIL's creditors.  A true and correct copy of these documents is attached as Exhibits 3, 4, and 5 to the Martin Declaration. The CVA is conditional on the implementation of the restructuring of the Abengoa Group in accordance with the Master Restructuring Agreement, among other things.  ACIL's creditors' claims arise primarily from guarantees made in respect of the obligations of other members of the Abengoa Group.  The CVA proposes to compromise the liabilities of ACIL as guarantor with respect to certain Guarantee Obligations related to loans and notes owed to Guarantee Creditors who have not acceded to the Master Restructuring Agreement in accordance with the Standard Restructuring Terms.

33.     Under the CVA those Guarantee Creditors that have not acceded to the Master Restructuring Agreement and elected to receive Alternative Restructuring Terms either prior to the meeting of creditors to approve the CVA or during the Supplemental Accession Period (described in detail in the CVA)[6] will have their claims affected as follows:

> a.  ACIL's Guarantee Obligations owed to Non-Consenting Creditors will be written down by 97%, consistent with the amendment of the principal claims of the Non-Consenting Creditors in respect of the Loans and Notes which will

---

[6]     As noted in the Nominee's Report, Guarantee Creditors holding, by value, 93.69 % of all Guarantee Creditor claims, and 93.43% of all unsecured creditor claims in ACIL, have already acceded to the Master Restructuring Agreement, which obligates them to, among other things, vote in favor of the ACIL CVA, which means, as noted by the Nominees, that ACIL already has the requisite majority for approval of the CVA even prior to the meeting of creditors.

be written down by 97% by the Homologation of the Master Restructuring Agreement and will be amended such that they shall only become due and payable upon default in payment of the principal obligations under the Loans and Notes, as amended;

b. Subject to the amendments imposed by the Standard Restructuring Terms, the Loans and Notes will continue to exist in full force and effect with the same original Obligors, but will be deemed automatically amended upon the Standard Restructuring Terms including immediate disapplication of any mandatory prepayment events, covenants, undertakings, representations, events of default, acceleration events and/or termination events or any clauses of similar effect;

c. All principal payment obligations under the written down Loans and Notes will be amended such that all principal amounts fall due and payable on the 10 Year Maturity Date;

d. The written down and amended principal obligations under the Loan and Notes will be subordinated to the Senior and Junior Old Money Loans/Notes; and

e. There will be no equity interest in consideration of the write down of the obligations.

34.    Other key terms of the Global Restructuring (and hence the CVA) include:

a. The claims of ordinary creditors (i.e., non-financial creditors) are excluded from the Global Restructuring (and the CVA), and will be paid in full in the normal course of business;

b. In respect of Intragroup Creditors (i.e., intercompany claims), all relevant Abengoa Group companies have acceded to the Master Restructuring Agreement and have accepted the Standard Restructuring Terms, other than the companies in the Bankruptcy Cases, which will accede upon confirmation of the chapter 11 plan; and

c.  The CVA will prevent Guarantee Creditors from making any claim against ACIL's Co-Guarantors (the "**Anti-Suit Provisions**"), the prosecution of which would be inconsistent with the amended principal obligations of the Loans and Notes owed to such Guarantee Creditors.

35.    The meeting of creditors and members of ACIL to vote on the CVA Proposal will be held on November 24, 2016; thereafter, and once the Chairman of the CVA meetings (who will be one of the Nominees) has filed its report with the UK Court, there will be a 28 day period

during which challenges can be made to the CVA, which if made, will be decided by the court in the United Kingdom.  As noted above, the creditors affected by the CVA have acceded to the Master Restructuring Agreement in large percentages and the likelihood of a challenge to the CVA is minimal.

36.    Under the Master Restructuring Agreement, there is a supplemental period to accede thereto (the "**Supplemental Accession Period**").  The Supplemental Accession Period applies to all Guarantee Creditors who did not initially accede to the Master Restructuring Agreement, whether or not they voted to approve the CVA at the creditors' meeting, and provides those parties with an additional five (5) days following the Restructuring Effective Date to accede to the Master Restructuring Agreement and receive the Alternative Restructuring Terms.

37.    In sum, the CVA effectuates the part of the Global Restructuring discussed herein.

## RELIEF REQUESTED

38.    Based on the factual background submitted in paragraphs 1 to 37 of this Petition and the Declarations or Affidavits offered in support of this Petition together with the materials attached thereto, the Foreign Representative requests that this Court recognize the UK Proceeding as a foreign main proceeding under Bankruptcy Code §§ 101(23), 1502(4), and 1517, and that the Court grant related relief under Bankruptcy Code §§ 1520 and 1521.

39.    After notice and a hearing at which this Petition is considered, the Foreign Representative seeks entry of a Final Order, substantially in the form attached hereto as Exhibit A, granting relief, including, but not limited to:

a.    Recognizing the UK Proceeding as a foreign main proceeding in accordance with Bankruptcy Code §§ 101(23), 1502(4), 1517, and 1520;

b.    Recognizing the Foreign Representative as the Debtor's "foreign representative" as such term is defined in Bankruptcy Code § 101(24);

c. Granting the Foreign Representative the rights and protections to which it is entitled under chapter 15 of the Bankruptcy Code, including, but not limited to, the protections limiting the jurisdiction of U.S. Courts over the Foreign Representative in accordance with Bankruptcy Code §§ 306 and 1510;

d. Approving and fully effectuating CVA and extending its terms within the territorial jurisdiction of the United States; and

e. Granting such other relief as may be necessary and appropriate, including entry of a Final Decree after entry of the Order granting the relief requested.

40.     The Foreign Representative seeks this relief at this time, but expressly reserves his right to request other, additional, or further relief or assistance as may be just and appropriate at any Final Hearing on this Petition and by further application after the Final Hearing in accordance with section 1507 of the Bankruptcy Code or otherwise.

## **CONCLUSION**

WHEREFORE, ACIL, in its capacity as Foreign Representative, respectfully petitions the Court for recognition and relief under chapter 15 of the Bankruptcy Code, the relief requested herein, and for such other relief and assistance as may be necessary.

Dated: November 16, 2016
       Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

By:   */s/ R. Craig Martin*
    R. Craig Martin, Esq. (Bar No. 5032)
    Maris J. Kandestin (DE 5294)
    1201 North Market Street, 21st Floor
    Wilmington, DE 19801
    Telephone:  302.468.5700
    Facsimile:  302. 778.7834
    e-mail:  craig.martin@dlapiper.com
           maris.kandestin@dlapiper.com
    -- and—

    Richard A. Chesley, Esq.
    203 North LaSalle Street
    Suite 1900
    Chicago, IL 60601-1293
    Phone:  312.368.4000
    Fax:  312.236.7516
    e-mail:  richard.chesley@dlapiper.com

    *Attorneys for Foreign Representative of*
    *Foreign Debtor, Abengoa Concessions*
    *Investments Limited*

## VERIFICATION

I, Anders Christian Digemose, the authorized representative of Abengoa Concessions Investments Limited, certify that I am authorized to make this verification in my capacity as a duly authorized officer of Abengoa Concessions Investments Limited, and that based upon reasonable and good faith investigations, and the knowledge and information known to me to date, the facts set forth in the *Verified Petition Under Chapter 15 for Order and Final Decree Granting Recognition of a Foreign Main Proceeding and Permanent Injunctive and Other Related Relief* are true and correct to the best of my knowledge, information and belief.

Dated: November 15, 2016

_____
*Authorized Officer of Foreign*
*Representative of Abengoa Concessions*
*Investments Limited*