UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------ x

*In re*

Abengoa Concessions Investments Limited,

                    Debtor in a foreign proceeding.

------------------------------------------------------ x

Chapter 15

Case No. 16-12590____ (_KJC_)

## DECLARATION OF REBECCA LOIS JARVIS IN SUPPORT OF VERIFIED PETITION UNDER CHAPTER 15 FOR RECOGNITION OF A <u>FOREIGN MAIN PROCEEDING AND OTHER RELIEF</u>

I, Rebecca Lois Jarvis, declare under penalty of perjury as follows to the best of my knowledge, information, and belief:

1.     I am a solicitor duly admitted to practice in England and Wales and a partner in the law firm of Linklaters LLP, located at One Silk Street, London, EC2Y 8HQ, United Kingdom.  I submit this declaration (the "**Declaration**") in support of the Verified Petition under Chapter 15 for Recognition of a Foreign Main Proceeding and Other Relief (together with the Form of Voluntary Petition filed contemporaneously herewith, the "**Petition**") filed in the above-captioned chapter 15 case.  The Petition seeks, among other relief, chapter 15 recognition of a company voluntary arrangement proposed by the directors of Abengoa Concessions Investments Limited (the "**Foreign Debtor**") pursuant to Part I of the Insolvency Act 1986 (the "**Insolvency Act**") ("**CVA)** to the extent that the CVA is duly approved by the requisite majority of creditors at the creditors' meeting in accordance with applicable English law. The CVA proposed by the Foreign Debtor is set out in full at EXHIBIT 3 OF DECLARATION OF R. CRAIG MARTIN REGARDING DETERMINATION OF FOREIGN LAW (the "**Martin Declaration**").

2.      Capitalised terms not otherwise defined in this Declaration shall have the meaning given to them in the Petition.

3.      As of the date of this Declaration, the CVA is pending approval by creditors at the creditors' meeting to be held at Linklaters LLP, 1 Silk Street, London, EC2Y 8HQ at 10:00 a.m. (London time) on 24 November 2016 and by members at the members' meeting to be held at the same location on the same date at 11:00 a.m. (London time).

4.      As set forth in more detail in the Petition, if implemented, the CVA will among other things:

        a.  provide a mechanism whereby liabilities of the Foreign Debtor, as guarantor, in respect of certain loans and notes borrowed or issued (as applicable) by other entities within the Abengoa Group ("**Guarantee Obligations**") owed to creditors who do not accede to the Master Restructuring Agreement shall be subject to a write-down of 97 per cent. to reflect the compromise of the relevant principal obligations of those loans and notes owed to such creditors, which will be implemented by the Homologation of the Master Restructuring Agreement (the "**Compromised Principal Obligations**");

        b.  amend the terms and conditions of the Guarantee Obligations; and

        c.  prevent certain creditors from making any demand, bringing any claim or taking (or voting in favour of) any enforcement action in any jurisdiction whatsoever in a manner inconsistent with the Compromised Principal Obligations against the Foreign Debtor's co-guarantors of the relevant loans and notes.

5.      In this Declaration, after describing my background and qualifications, I provide a description of English law and practice relevant to this Court's consideration of the Petition.  I

also wish to advise this Court of the procedures and schedule of events relating to the CVA underway with respect to the Foreign Debtor.

6.     In preparing this Declaration, I have reviewed (i) the Petition and (ii) relevant provisions of the Insolvency Act and other relevant provisions of English and EU law as I consider may relate to chapter 15 of title 11 of the United States Code and other aspects of U.S. bankruptcy law.

## PROFESSIONAL BACKGROUND AND QUALIFICATIONS

7.     I note for completeness that the surname on my passport (being my surname following marriage) is "Stirling", however my family surname and the surname I have used throughout my professional career is "Jarvis". Relevant aspects of my legal background are as follows: I earned my undergraduate bachelor of laws degree from Nottingham University, and I subsequently undertook my Solicitors Final Examination in 1990, which I passed at the first attempt.  I undertook my solicitor's training contract with the firm of Dibb Lupton Broomhead between September 1990 and September 1992 and was admitted to practice as a solicitor of the higher courts of England and Wales on 15 March 1993.  I am a partner in, and Global Co-Head of, the Restructuring and Insolvency Group of Linklaters LLP, based in the London office, and have concentrated on domestic and cross-border restructuring and insolvency legal practice since my qualification in September 1992.

8.     I have considerable experience in matters related to English insolvency law. In particular, I have advised debtors, creditors and insolvency practitioners in a significant number of formal insolvency proceedings, out-of-court restructurings and other related matters. I have advised on or in connection with several CVA proposals by debtor companies to their creditors under the Insolvency Act.

3

9.      I, together with other partners and associates in my firm, have been advising the Abengoa Group on all English law aspects of the Abengoa Group's restructuring and the Foreign Debtor in respect of its CVA and the extraterritorial effects and recognition of the same, since early November 2015.

## STATEMENTS ON ENGLISH LAW AND PRACTICE

10. Sections 1 to 7 of the Insolvency Act permit a company and its creditors to agree to (i) a composition in satisfaction of the company's debts, or (ii) a scheme of arrangement of its affairs[1], therefore a CVA be used to effect a restructuring, or partial payment and settlement, of a company's unsecured debts and obligations. Attached as **EXHIBIT 2 OF THE MARTIN DECLARATION** is a true copy of Sections 1 to 7 of the Insolvency Act.

11. A CVA is initiated by the debtor company (or its liquidator or administrator (as applicable)) preparing a proposal for a CVA (a "**proposal**") and a statement of affairs of the company, which must contain prescribed particulars such as details of the company's assets, liabilities and unsecured creditors. The statement of affairs is provided by the debtor company to the nominees appointed in connection with the CVA (the "**nominees**") and is designed to assist the nominees in preparing their report on the proposal to the High Court of Justice in England and Wales (the "**English Court**").

12. Generally, the role of the nominees, who must be licenced insolvency practitioners, is to review the proposal and to oversee the CVA procedure up to and including approval of the CVA at the creditors' meeting.

13. Before the proposal can be distributed to creditors and members, the nominees must review the proposal (including the statement of affairs) and then file a report with the English

---

[1]      Section 1(1) of the Insolvency Act

Court opining that (i) the proposed CVA has a reasonable prospect of being approved and implemented and (ii) the creditors' meeting and the members' meeting should be convened for members and creditors, respectively, to vote to approve or reject the proposal, and confirming the date, time and place of the proposed meetings.

14. The nominees must exercise independent judgment as to whether the arrangement proposed by the CVA has a reasonable prospect of being approved and whether the meeting of creditors and members should be held. The nominees must ensure the proposal is serious and viable so as to avoid meetings being unnecessarily convened and the associated waste of time and costs. It is not sufficient merely for the nominees to confirm the proposal meets the statutory requirements, the role of the nominees is to scrutinize the proposal, offer guidance to the debtor company and not merely act as a post-box for the proposal.

15. In this case the nominees were instructed by the Foreign Debtor as proposed nominees on 15 September 2016 and since that date the nominees and their staff have assisted the Foreign Debtor, its directors and their respective advisers in the preparation of the proposal and the statement of affairs, based on information contained in ACIL's books and records, the representations of the directors and information provided by other entities within the Abengoa S.A. group (of which ACIL is a part). In this case the directors of the Foreign Debtor delivered the proposal dated 9 November 2016 (including the statement of affairs as at 30 September 2016) to the nominees on 9 November 2016 and the nominees filed their report (as well as a copy of the proposal and the statement of affairs) with the English Court on 9 November 2016. The nominees delivered notice of the meetings, to creditors and members, on 9 November 2016, and the meetings of creditors and members will be held at Linklaters LLP, 1 Silk Street, London, EC2Y 8HQ, United Kingdom at 10:00 a.m. and 11:00 a.m. (London time) respectively.

16. A CVA must be approved at the meetings convened for the purpose of considering the proposal by (i) creditors holding in excess of 75% in value of the aggregate claims against the company and (ii) more than 50% in value of the company's members, each of whom is eligible to vote and does vote at such meetings. The voting tallies are not required to be scrutinized or confirmed by an independent third party as it is the duty of the chairman (who must be one of the nominees and therefore is a licensed insolvency practitioner) to report to the English Court on the outcome of the meetings.

17. However, any CVA resolution approving the proposal is automatically invalid if more than half in value of the unsecured creditors who are not connected with the company vote against the CVA resolution at the creditors' meeting.

18. If the outcome of the members' meeting differs from the outcome of the creditors' meeting, the decision of the creditors' meeting will prevail, subject to the right of any member to apply to the English Court to challenge the approval of the arrangement.

19. Although subject to challenge during a 28-day statutory period (on grounds of either material irregularity or unfair prejudice), a CVA becomes binding immediately upon its approval by creditors at the creditors' meeting. Its implementation, however, may be subject to the satisfaction of conditions precedent depending on the precise terms of the CVA, such as recognition in the United States under chapter 15 of title 11 of the United States Code. Once approved and subject to the satisfaction of any conditions precedent, a CVA becomes binding on all unsecured creditors who were entitled to vote at the creditors' meeting, whether or not they voted in favour thereof or were present in person or by proxy at the creditors' meeting. A CVA, however, cannot affect the rights of secured or other preferential creditors without their consent.

20. Once approved by the requisite majority of creditors, a CVA is managed and implemented by a supervisor ("**supervisor**") who must act in accordance with the terms of the CVA and who is subject to the supervision and control of the English Court. In this case, assuming the CVA is approved at the creditors' meeting, the nominees will become the supervisors, which is quite typical.

21.    Notwithstanding the Foreign Debtor's pending CVA, the Foreign Debtor's board of directors' powers to manage the company, its assets, business and operations and control the company's corporate actions in the ordinary way are unaffected.  In particular, the Foreign Debtor's board of directors retain all necessary corporate powers and authority to authorise the Foreign Debtor, itself, to act as its foreign representative for the purpose of seeking recognition of the CVA in the United States under chapter 15 of title 11 of the United States Code. Further, the powers and authority of the Foreign Debtor's board of directors will also be unaffected by approval of the CVA and appointment of the nominees as supervisors. Thus, while it certainly would have been possible for the supervisors to have acted as the Foreign Debtor's foreign representative, under the present circumstances where it was necessary to file the Petition prior to the supervisors appointment in order to meet the timing requirements under a broader global restructuring, it was appropriate and permissible under English law for the Foreign Debtor's board to appoint the Foreign Debtor as the foreign representative and to authorize certain individuals to execute the necessary documents on behalf of the Foreign Debtor to commence the chapter 15 case.

22.    Creditors and members may challenge the approval of the CVA in the English Court on statutory grounds that (i) the CVA unfairly prejudices the interests of a creditor, member or contributory of the company; or (ii) there has been some material irregularity at or in

7

relation to either of the meetings, within 28 days after the filing of a report by the chairman of the creditors' meeting and the members' meeting with the English Court, or, in the case of a creditor who was not given effective notice of the creditors' meeting, within 28 days of the day on which he or she becomes aware that the creditors' meeting had taken place.

23.     Under the Insolvency Act, if a creditor or member of the debtor company challenges approval of the CVA the English Court has wide powers in respect of a CVA including the power: (a) to override the decision of the creditors' meeting to approve the proposals underlying a CVA on application by a member; (b) to terminate the appointment of the supervisor under the CVA; (c) to revoke or suspend the approval of a CVA on the grounds of unfair prejudice or material irregularity and to make supplemental directions; (d) to give directions for further meetings to consider a revised version of the original proposals, or to reconsider the original proposal where there was some material irregularity at either of the original meetings and to make supplemental directions; (e) to confirm, reverse or modify any act or decision of the supervisor; (f) to give directions in relation to any particular matter arising under a CVA, on the application of the supervisor, and (g) to grant such other relief as the High Court considers just and appropriate.

24. As stated in paragraph 19 of this declaration, a CVA becomes binding immediately, in accordance with its terms and subject to any conditions precedent, on all unsecured creditors who were entitled to vote at the creditors' meeting upon its approval by creditors at the creditors' meeting and shall remain in full force and effect in accordance with its terms unless successfully challenged by creditors or members.

25. A CVA is listed as an insolvency proceeding in Annex A to the European Council Regulation 1346/2000 on insolvency proceedings (the "**EC Regulation**"), meaning A CVA is

8

considered to be a collective insolvency proceeding for the purposes of the EC Regulation. Under the EC Regulation, a collective proceeding is an insolvency proceeding aimed at reorganisation of a company or the distribution of its assets to the company's creditors as a whole.

26.     Pursuant to Article 16 of the EC Regulation, the courts of the European Union member states (other than Denmark) are obliged to recognise a CVA for a company with its centre of main interest located in England.

[*Remainder of page intentionally left blank.*]

## CONCLUSION

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 16th day of November 2016

In London, United Kingdom

Rebecca Lois Jarvis

Partner, Linklaters LLP